# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.   $19-143-M-1$
2424 South 20th Street, Philadelphia, Pennsylvania (for more )
particularized description, See Attachment A) )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*

2424 South 20th Street, Philadelphia, Pennsylvania, (for more particularized description, See Attachment A)

located in the ____ Eastern ____ District of _ _ _ _ Pennsylvania _ _ _ _ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C §§ 892; 894; 924(c) | Making extortionate extensions of credit, collections of extension of credit by extortionate means; use and carrying firearm during crime of violence. |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of        days (give exact ending date if more than 30 days: _ _ _ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Gary Cooper, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  1/29/19

City and state: Philadelphia, PA

_____
*Judge's signature*

ELIZABETH T. HEY, U.S. MAGISTRATE JUDGE
*Printed name and title*

AO 106 (Rev 04/10) Application for a Search Warrant (requesting AUSA JOHN S HAN

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

|  |  |  |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  19-143-M-2 |
| 2018 White Ford F250 vehicle, bearing New Jersey registration of U15JYJ (for more particularized description, See Attachment A) | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*

2018 White Ford F250 vehicle, bearing New Jersey registration of U15JYJ (See Attachment A)

located in the _____ Eastern _____ District of __ ____ Pennsylvania __ _ _ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U S.C §§ 892; 894; 924(c) | Making extortionate extensions of credit; collections of extension of credit by extortionate means, use and carrying firearm during crime of violence. |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: __ _ _ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Gary Cooper, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _1/29/19_

_____
*Judge's signature*

City and state: Philadelphia, PA

ELIZABETH T. HEY, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Gary Cooper, am a Special Agent with the Organized Crime Squad of the Federal Bureau of Investigation ("FBI") Philadelphia Division, being duly sworn, depose and state:

## INTRODUCTION AND AGENT BACKGROUND

1. I am employed as a Special Agent of the Federal Bureau of Investigation ("FBI"). I have been employed as an FBI Special Agent since September 2017. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, U.S.C. § 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Titles 18 and 21 of the United States Code ("U.S.C."). Prior to becoming an FBI Special Agent, I was a police officer in Maryland for four years, where I gained experience investigating felonies and drafting and executing search warrants.

2. As part of my duties with the FBI, I investigate violations of federal criminal law over which the FBI has jurisdiction, including violent crime, narcotics offenses, and organized crime. Over the course of these investigations, I have conducted interviews of witnesses, victims, and suspects, participated in physical and electronic surveillance, and utilized pen registers and trap and trace devices. I have participated in searches authorized by consent, search warrants, and other legal grounds, for residences, businesses, cellular telephones, and vehicles for the purpose of obtaining evidence. While employed by the FBI, I have also participated in investigations classified under the Organized Crime Drug Enforcement Task Force ("OCDETF"), which is a national initiative focused on targeting criminal organizations.

3. I am currently assigned to an FBI squad that investigates the Philadelphia organized crime family of La Cosa Nostra ("LCN"). Through my training, education, and experience, I have become familiar with the hierarchy and organizational structure of the Philadelphia LCN Family, its criminal activities, and the efforts of individuals associated with this criminal enterprise to avoid detection by law enforcement.

4. The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested ~~arrest~~ warrants, but does not set forth all of my knowledge about this matter.  *Search*

5. Based on the information outlined in this affidavit, as well as my training and experience, I have probable cause to believe that JOHN FLORIO has committed the following violations: making extortionate extensions of credit, in violation of 18 U.S.C. § 892, collections of extensions of credit by extortionate means, in violation of 18 U.S.C. § 894, and use and carrying a firearm during and in relation to a crime of violence, in violation of 18 United States Code, § 924(c)(1)(A), hereinafter referred to as "SUBJECT OFFENSES."

1

6. This affidavit is submitted in support of an Application for a search warrant to search 2424 South 20th Street, Philadelphia, Pennsylvania, hereinafter referred to as "SUBJECT RESIDENCE," and a white, 2018 Ford F250 bearing New Jersey registration U15JYJ, herein referred to as "SUBJECT VEHICLE," both further described in Attachment A, and to search and seize any and all cellular telephones that may be found in the SUBJECT RESIDENCE and SUBJECT VEHICLE, as set forth in Attachment B.

## FACTS ESTABLISHING PROBABLE CAUSE

7. On November 10, 2018, an individual, who will be referred to as Cooperating Witness 1 ("CW-1" [1]) took a $4,000 loan from JOHN FLORIO, which CW-1 later reported to the FBI. According to CW-1, the terms of the loan required CW to pay back $4,600 to FLORIO by Thursday November 15, 2018.[2] CW-1 knew FLORIO for approximately 6 years because FLORIO was a regular customer at CW-1's business. According to CW-1, CW-1 heard through a friend that FLORIO was a loan shark who sold pills and ran a sportsbook. According to CW-1, at one point in the past, FLORIO had told CW-1 that if the CW-1 ever needed anything, to let FLORIO know. CW-1 understood this to mean that FLORIO would give CW-1 a loan if CW-1 needed one.

8. Between November 16, 2018 and January 24, 2019, CW-1, at the direction of the FBI, met with FLORIO ten times to make payments on the loansharking loan. The meetings were consensually recorded by CW-1, using equipment provided by the FBI. The meetings were also surveilled by Agents and Task Force Officers of the FBI and Pennsylvania State Police. During this time period, CW-1 paid FLORIO a total of $3,640, money that was provided by the FBI. During ten of the meetings between FLORIO and CW-1, FLORIO arrived in SUBJECT VEHICLE.

9. On November 16, 2018, CW-1 recorded a meeting with FLORIO and paid $1,000. FBI surveillance agents observed FLORIO arrive in SUBJECT VEHICLE. During the meeting, which CW-1 recorded, FLORIO and CW-1 attempted to figure out a date when CW-1 would have to pay the loan in full. FLORIO and CW-1 agreed on a day in two weeks and FLORIO told CW-1 that if it was not paid by then, FLORIO would become a partner in CW-1's business. FLORIO warned CW-1 that CW-1 cannot "jam" FLORIO

---

[1] From November 30, 2001 through December 12, 2006, the FBI operated CW-1 as a cooperating source on national security matters. Due to his cooperation, CW-1 obtained an immigration benefit from the government. Regarding his past cooperation on national security matters, the FBI considered the information provided by CW-1 to be reliable and credible. The FBI administratively closed CW-1 as a cooperating source in 2006 at the conclusion of the pertinent national security investigations. During the period of CW-1's cooperation, the FBI paid CW-1 a total of $995.20, $500.00 of which was for services rendered and $495.20 was for expenses associated with CW-1's cooperation.

[2] CW-1 was cooperating with the FBI at the time but was not acting at the direction of the FBI in taking a loan from FLORIO. CW-1 was admonished by the FBI for doing this and instructed not to take loansharking loans, except at the direction of the FBI. CW-1 explained that CW-1 fell behind on bills and needed the money to pay rent, car and utility bills.

up, referencing missing loan payments and told CW-1 that "friendship is friendship, business is business."

10. On November 20, 2018, CW-1 recorded a meeting with FLORIO, which did not involve a payment from CW-1 to FLORIO. FBI surveillance agents observed FLORIO arrive in SUBJECT VEHICLE. FLORIO and CW-1 had mostly non-pertinent and inaudible discussions. During the course of the meeting, FLORIO said to CW-1 "half this week and half next week," referencing CW-1 making two payments per week to FLORIO. One payment would be half and the second payment would be the other half.

11. On November 28, 2018, CW-1 recorded a meeting with FLORIO, which did not involve a payment from CW-1 to FLORIO. CW-1 told FLORIO that CW-1 would see FLORIO on Friday, referencing a loan payment, and asked FLORIO, "If not Friday, what's going to happen?" FLORIO responded, "Don't pay, you'll see."

12. On November 30, 2018, CW-1 recorded a meeting with FLORIO and paid $800. FBI surveillance agents observed FLORIO arrive in SUBJECT VEHICLE. FLORIO told CW-1 that they both agreed on a deal for two weeks and 20%. FLORIO said that the interest rate was now going to be 40% for five weeks. FLORIO said CW-1 needed to pay him $760 a week for five weeks. FLORIO told CW-1 that if CW-1 missed a weekly payment, CW-1 would have to pay $260 in interest only.

13. On December 7, 2018, CW-1 recorded a meeting with FLORIO and paid $260. FBI surveillance agents observed FLORIO arrive in SUBJECT VEHICLE. FLORIO questioned CW-1 about only paying interest on CW-1's first payment and CW-1 explained that money was tight for CW-1. FLORIO told CW-1 that CW-1 had to make a payment the following week and CW-1 could not just pay the interest again. FLORIO said, "Anybody else would've fucked you … I did, I saved you from getting beaten." CW-1 questioned who FLORIO was referring to and FLORIO responded, "From who? Motherfuckers who are back with me, with this shit. They don't fuck around, these dudes." FLORIO continued, "The people you know are clowns. That's who you know. You don't know these people. These are people, when they gotta come see you, it's bad. I mean, they do fucked up shit … I've seen them tear out guys' fingernails."

14. On December 12, 2018, CW-1 recorded a meeting with FLORIO and paid $300. FBI surveillance agents observed FLORIO arrive in SUBJECT VEHICLE. FLORIO told CW-1, that CW-1 needed to give FLORIO two payments a week and CW-1 should pay FLORIO "three something" on Wednesday and "three something" on Saturday. CW-1 said he would try to do it and FLORIO said, "Well, that's what you gotta do." FLORIO told the CW-1 to make the payments and pay off the loan. FLORIO said that in paying off the loan, CW-1 would be able to borrow more money from FLORIO. FLORIO and CW-1 discussed difficult times with making money and family life. FLORIO told CW-1 that CW-1 is lucky to have never gone to prison, stating that he (FLORIO) spent years in prison. CW-1 told FLORIO that he had to be careful. FLORIO said, "These motherfuckers, they wanna lock you up. That's what they do." FLORIO then warned

CW-1 about "rats" and "snitches" and stated to CW-1, "I get nuts with rats, that's where I don't fuck around, but I don't play no games either."

15. On December 19, 2018, CW-1 recorded a meeting with FLORIO and paid $240. FBI surveillance agents observed FLORIO arrive in SUBJECT VEHICLE. FLORIO told CW-1 that FLORIO needed to get the payments and stated, "That's how they borrow the money… they need it back in chunks." CW-1 asked FLORIO to talk to FLORIO's money supplier and convey to the money supplier to "take it easy" on CW-1. FLORIO said, "He is, he ain't doin nothing … right now it is what it is."

16. On December 28, 2018, CW-1 recorded a meeting with FLORIO and paid $240. FBI surveillance agents observed FLORIO arrive in SUBJECT VEHICLE. During the meeting, CW-1 expressed concern to FLORIO about people hurting CW-1 and FLORIO told CW-1, "No, no, no, that's only if you didn't pay." CW-1 responded to FLORIO by saying, "I didn't pay, they would go after me, right?" FLORIO responded saying, "Well, you'd be wrong. What am I gonna do?" FLORIO continued: "They'd turn against me, you understand? ... I mean, if you did that, then you'd be in the wrong." Later in the conversation, FLORIO told CW-1, "You fuck with, I am your friend, but you messed with the wrong people man. They'll fuck you up … no not me, I'm saying other people."

17. On December 28, 2018, CW-1 and FLORIO also had a conversation about changing the terms of CW-1's loan with FLORIO. FLORIO told CW-1 that CW-1 could pay $450 a week for eight weeks to pay off the debt or just pay interest at $200 a week. FLORIO stated, "Alright, let me put it in here, hold on, so we know what it is." FLORIO then took out a cellular telephone and inputted what CW-1 had paid in a Notes type application on the cellular telephone. FLORIO showed CW-1 what he was putting in the cellular telephone and while doing so, CW-1 observed approximately five other names with associated dollar amounts next to the names. FBI surveillance agents observed FLORIO hold up the cellular telephone to CW-1 during their meeting.

18. On January 4, 2019, FLORIO sent CW-1 a text message from (267) 972-5928 that read, "I need you to have a whole one, OK no more,, 8 week 475, Please don't play no more." CW-1 understood this message to mean that FLORIO was demanding CW-1 to begin paying $475 a week for eight weeks. CW-1 and FLORIO also had a meeting on January 4, 2019 in which CW-1 paid $200 to FLORIO. FBI surveillance agents observed FLORIO arrive in SUBJECT VEHICLE. This meeting was not recorded as a result of an equipment malfunction.

19. On January 10, 2019, CW-1 recorded a meeting with FLORIO and paid $200. Prior to the meeting, FBI surveillance agents observed the SUBJECT VEHICLE in the area of 2332 South 20th Street, Philadelphia, Pennsylvania with the hazard lights on. FLORIO was observed entering SUBJECT VEHICLE and leaving the area. FBI surveillance agent observed FLORIO arrive to the meeting location with CW-1 in the SUBJECT VEHICLE. Upon FLORIO arriving to meet CW-1, FLORIO stated, "Here, I got something for you … Here." CW-1 responded, "Oh don't play with a fucking gun man, what's wrong with you. What the fuck? What's up my man? Still cold, still cool John

4

... Where you coming from?" FLORIO stated: "How about if that nigger comes and shoots at us?" and CW-1 replied, "You never know." FLORIO asked "Then you want me to have the gun, huh?" During a debrief of CW-1, CW-1 informed FBI agents that FLORIO pointed a small, black handgun at CW-1. CW-1 advised FBI agents that FLORIO reached across SUBJECT VEHICLE, reached into the glove compartment of SUBJECT VEHICLE and retrieved the small, black handgun. FLORIO then reached back across SUBJECT VEHICLE and pointed the handgun at CW-1. CW-1 advised FBI agents that FLORIO then put the small, black handgun back into the glovebox of SUBJECT VEHICLE before exiting SUBJECT VEHICLE. FBI agents reviewed surveillance camera footage and observed FLORIO reach across the SUBJECT VEHICLE immediately after arriving in the SUBJECT VEHICLE. FLORIO returned to the seated position in the driver's seat for a moment and opened the driver's door of the SUBJECT VEHICLE. FLORIO then reached across the SUBJECT VEHICLE into the glovebox before exiting the SUBJECT VEHICLE. According to CW-1, CW-1 has previously observed FLORIO with a handgun on his person and FLORIO has mentioned to CW-1 that he carries a handgun. Based on my training and experience, I believe that FLORIO stores the handgun inside the SUBJECT VEHICLE.

20. On August 5, 2017, FBI's Public Access Line ("PAL") received a call from an individual who provided information stating that FLORIO was in possession of weapons inside SUBJECT RESIDENCE.[3]  This caller also provided the PAL with FLORIO's known phone number of (267) 972-5928.

21. On January 16, 2019, CW-1 recorded a meeting with FLORIO and paid $200. FBI surveillance agents observed FLORIO arrive in SUBJECT VEHICLE. During the meeting, FLORIO explained to CW-1 that he only deals with "good people." FLORIO told CW-1 that people haven't paid before and CW-1 questioned if that was bad. FLORIO responded that it was bad. FLORIO warned CW-1 that, for example, if CW-1 doesn't pay, the barber shop would have broken windows, CW-1's tires would be cut, and there would be broken windows in CW-1's house. FLORIO added these were all things that couldn't be traced back to FLORIO.

22. On January 23, 2018, FBI surveillance agents observed FLORIO exit the SUBJECT RESIDENCE. A check of Pennsylvania Department of Transportation revealed that FLORIO listed the SUBJECT RESIDENCE as his current address. Based on my training and experience, as well as the information from CW-1 and the surveillance conducted by FBI agents as discussed above, as well as the prior information from the PAL informant, I believe that FLORIO stores firearms inside the SUBJECT RESIDENCE.

23. On January 24, 2019, FBI surveillance observed SUBJECT VEHICLE parked in front of SUBJECT RESIDENCE. A white van, bearing Pennsylvania registration ZML2751, approached and parked behind SUBJECT VEHICLE. The white van had "FLORIO HOME REMODELING" written on the side. An open source search revealed FLORIO HOME REMODELING also utilized the name FLORIO CONSTRUCTIONS. FLORIO

---

[3] FBI agents attempted to speak with the PAL caller after a review on May 21, 2018, but were unsuccessful in reaching the caller and the line appeared to be disconnected.

HOME REMODELING also listed SUBJECT RESIDENCE as the address and (267) 972-5928 as the phone number. FLORIO exited the SUBJECT RESIDENCE and entered SUBJECT VEHICLE. FLORIO later met with CW-1 and CW-1 paid FLORIO $200.

## CELLULAR PHONE ANALYSIS

24. From November 10, 2018 through November 30, 2018, FLORIO and CW-1 were in telephonic contact 23 times via (267)972-5928, comprising of 17 calls and 6 text messages. According the Sprint Wireless records, (267) 972-5928, is subscribed to JOHN FLORIO at SUBJECT RESIDENCE, 2424 South 20th Street, Philadelphia, Pennsylvania 19145 and is assigned to Electronic Serial Number (ESN) 089575424901285393. According to Pennsylvania Department of Transportation, JOHN FLORIO's address on his Pennsylvania driver's license is SUBJECT RESIDENCE, 2424 South 20th Street, Philadelphia, Pennsylvania 19145.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

25. This application also seeks permission to search and seize electronic devices, including cellular telephones, for evidence described in Attachment B. As used herein, the term "electronic device" includes any electronic system or device capable of storing or processing data in digital form, in this case referring specifically to wireless or cellular telephones.

26. Based on my training and experience, I am aware that individuals involved in criminal activity often use multiple cellphones, including but not limited to smart phones or PDAs to store the telephone numbers for their criminal activity associates. I am aware that those involved with criminal activity often keep old cellphones at their residences to allow the individuals to restore contacts into newer cellphones. I am aware that those involved with criminal activity often keep old cellphones in close proximity to allow them to restore contacts into newer cellphones.

27. Based on my training and experience, I am aware individuals involved in criminal activity often maintain more than one phone or more than one SIM card device, in order to have multiple avenues to facilitate criminal activity, and in an attempt to avoid detection by law enforcement. I am aware that individuals involved in criminal activity often times utilize pre-paid cellular telephones which do not maintain specific subscriber information, and/or use phones subscribed to in the name of a third person, in order to mask their direct linkage to telephones utilized in furtherance of criminal activity. Further, those involved in criminal activity often change SIM cards in order to make it difficult for law enforcement to determine their records. Based on my training and experience, as well as the training and experience of other agents, I know that individuals involved in criminal activity also frequently switch telephone numbers and/or phones. Despite the constant switching of active telephone numbers, persons engaged in the SUBJECT OFFENSES often keep old phones.

6

28. Based on my training and experience, I am aware that persons engaged in the SUBJECT OFFENSES commonly utilize their cellular telephones to communicate with co-conspirators to facilitate, plan, and execute their criminal activity. For example, I know that persons engaged in the SUBJECT OFFENSES often store contacts lists, address books, calendars, photographs, videos, and audio files, text messages, call logs, and voice mails in their electronic devices, such as cellular telephones, to be used in furtherance of their criminal activity.

29. Specifically, I know that those involved in criminal activity communicate with associates using cellular telephones to make telephone calls. If they are unable to reach the party called, they frequently leave voice mail messages. I am aware that Apple-based and Android-based phones download voice mail messages and store them on the phone itself so that there is no need for the user to call in to a number at a remote location and listen to the message. In addition, I know those involved in criminal activity communicate with associates using cellular telephones and tablets to send e-mails and text messages and communicate via social media networking sites. By analyzing call and text communications, I may be able to determine the identity of co-conspirators and associated telephone numbers, as well as if there were communications between associates during the commission of the crimes.

30. Furthermore, cellular telephones also contain address books with names, addresses, photographs, and phone numbers of a person's regular contacts. I am aware that persons engaged in the SUBJECT OFFENSES frequently list criminal associates in directories, often by nickname, to avoid detection by others. Such directories as the ones likely contained in the seized cellular telephones, are one of the few ways to verify the numbers (*i.e.*, telephones, pagers, etc.) by others involved in the criminal activity, including victims.

31. In addition, I know that those involved with criminal activity often take photographs or make videos of themselves and their co-conspirators and retain them on their electronic devices such as cellular telephones. This evidence would show associations between accomplices, *i.e.* photographs of accomplices and/or individuals common to co-conspirators. I am also aware that persons engaged in the SUBJECT OFFENSES often take photographs or make videos of proceeds with their cellular telephones and tablets. Based on my training and experience, those who commit these crimes often store these items on their phones in order to show to associates, and/or to upload to social media.

32. Furthermore, I know that electronic devices, such as cellular telephones, can store information for long periods of time. Examples of such information include text and multimedia message conversations, call history, voice mail messages, e-mails, photographs, and other data stored on the device. Similarly, I know from my training and experience that when cellular telephones are used to access the internet, a browser history is also frequently stored for some period of time on the electronic device. This information can sometimes be recovered with forensic tools.

33. Furthermore, based on my training and experience, I am aware that persons engaged in the SUBJECT OFFENSES often use a cellular phone's Internet browser for web browsing activity related to their criminal activity. Specifically, persons engaged in the SUBJECT OFFENSES may use an internet search engine to explore where banks or mail delivery services are located, or may use the internet to make reservations for travel related to criminal activity. In addition, I know that persons engaged in the SUBJECT OFFENSES also use their cellular telephone's Internet browser to update their social networking sites in order to communicate with co-conspirators.

34. In addition, persons engaged in the SUBJECT OFFENSES sometimes use cellular telephones as navigation devices, obtaining maps and directions to various locations in furtherance of their criminal activity. These electronic devices may also contain GPS navigation capabilities and related stored information that could identify where these devices were located.

35. Furthermore, based on my training and experience, forensic evidence recovered from the review of a cellular telephone can also assist in establishing the identity of the user of the device, how the device was used, the purpose of its use, and when it was used. In particular, I am aware that cellular telephones are all identifiable by unique numbers on each phone, including: serial numbers, international mobile equipment identification numbers (IMEI) and/or electronic serial numbers (ESN). The search of each phone helps determine the telephone number assigned to each device, thus facilitating the identification of the phone as being used by members of the conspiracy. In addition, I am aware that by using forensic tools, information/data that users have deleted may still be able to be recovered from the device.

36. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices. In particular, I know that electronic devices, including cellular telephones used by persons engaged in the SUBJECT OFFENSES, are likely to be repositories of evidence of crimes. I know that an electronic device such as a cellular telephone may contain data that is evidence of how the electronic device was used, data that was sent and received, and other records that may indicate the nature of the offense.

37. Based on my experience and training, as well as the experience and training of other agents, I know that even when a user deletes information from a device, it can sometimes be recovered with forensics tools.

38. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that searching electronic devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of electronic devices and software programs in use today that specialized equipment is sometimes necessary to conduct a thorough search. In addition, it may be necessary to consult with specially

8

trained personnel who have specific expertise in the types of electronic devices, operating systems, or software applications that are being searched.

39. Furthermore, I am aware that electronic data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching electronic devices can require the use of precise, scientific procedures that are designed to maintain the integrity of electronic data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on electronic devices.

40. In addition, I know from my training and experience that the volume of data stored on many electronic devices will typically be so large that it will often require a search of the device in a law enforcement laboratory or similar facility. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

41. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), electronic devices can contain other forms of electronic evidence as well. In particular, records of how an electronic device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the electronic devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the electronic device was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

9

42. Further, evidence of how an electronic device has been used, what it has been used for, and who has used it, may be the absence of particular data on an electronic device. For example, to rebut a claim that the owner of an electronic device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the electronic device remotely is not present on the electronic device. Evidence of the absence of particular data on an electronic device is not segregable from the electronic device. Analysis of the electronic device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

43. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time consuming manual search through unrelated materials that may be co-mingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B. In addition, given that the affidavit is in support of the search of electronic devices recovered during the execution of a search warrant of the SUBJECT PREMISES, and these electronic devices will be then be stored as evidence with the FBI, there exists reasonable cause to permit the execution of a search of the seized electronic devices at any time in the day or night.

## FORENSIC EVIDENCE

44. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the cellular telephones were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the cellular telephones because:

45. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

10

46. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

47. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

48. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

### NATURE OF EXAMINATION

49. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of any and all cellular telephones found inside the SUBJECT RESIDENCE and SUBJECT VEHICLE. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

50. I know, through my training and experience, as well as from other law enforcement personnel with whom I have spoken and consulted, that persons engaged in the collection of unlawful debts often document the credits and debits of these loans.

### OTHER EVIDENCE

51. In addition to the above, I know that indicia of occupancy, residency and ownership of premises, including but not limited to utility and telephone bills, business records, addressed envelopes, rental, purchase or lease agreements, identification documents and keys are often maintained at a person's business or residence.

52. Based on my training and experience, I know that financial and business records, such as bank statements, canceled checks, checkbooks, passbooks, journals, ledgers, checks, drafts, letters of credit, certificates of deposit, wire transfer documents, money orders, withdrawal tickets, deposit slips, money cash bands, records of mutual funds, stocks, bonds, records of real estate transactions, invoices, bills, loan documents, business and financially-related correspondence and notes, certificates of insurance, lists of assets, records of safe deposit boxes, contain evidence of the controlling, transfer, and/or concealment of assets and the obtaining, controlling, transfer, concealment and/or expenditure of money and that these records can contain evidence of SUBJECT OFFENSES.

53. Based on my training and experience, I know that persons engaged in SUBJECT OFFENSES commonly prepare financial records including tax records or notes or calculations used to prepare taxes, bookkeeping records, records reflecting budgets, income, expenses, investments, bank accounts and, expenditures including expenditure, investment or deposit of cash, or any record of disposition of cash, in order to conceal the proceeds of SUBJECT OFFENSES.

54. In addition, I know that persons engaged in SUBJECT OFFENSES commonly maintain financial statements, bookkeeper's work papers and/or accountant's work papers used in the preparation of corporate and/or business records and tax returns; and communications with accountants, bookkeepers, money service businesses, merchants, retailers, credit card companies, and/or banks personal financial records including tax records or notes or calculations used to prepare taxes, bookkeeping records, records reflecting budgets, income, expenses, investments, bank accounts and, expenditures including expenditure, investments, deposits and records of disposition of cash.

## CONCLUSION

55. Based on the foregoing facts, I believe that there is probable cause that the fruits and/or evidence of crimes specifically, violations of the following offenses: making extortionate extensions of credit, in violation of 18 U.S.C. § 892, collections of extensions of credit by extortionate means, in violation of 18 U.S.C. § 894, and use and carrying a firearm during and in relation to a crime of violence, in violation of 18 United States Code, § 924(c)(1)(A) ("SUBJECT OFFENSES"), involving JOHN FLORIO, as enumerated in Attachment B, will be found in the SUBJECT RESIDENCE and SUBJECT VEHICLE, as well as in any cellular telephone found inside the SUBJECT RESIDENCE and SUBJECT VEHICLE. Accordingly, I respectfully request that the Court issue a warrant to search the SUBJECT RESIDENCE and SUBJECT VEHICLE as well as any and all cellular telephones found inside the SUBJECT RESIDENCE and SUBJECT VEHICLE.

56. Because of the sensitive nature of the investigation, I respectfully request that this Affidavit and the accompanying Application, Order and Warrant be filed under seal.

Disclosure of the contents of the Application, Order and Warrant would jeopardize the investigation, as the subject is not aware that he is the target of an investigation.

Respectfully submitted,

Gary Cooper
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed
Before me this 29 day of January , 2019

Honorable Elizabeth T. Hey
United States Magistrate Judge

13

## ATTACHMENT A (RESIDENCE)

The properties to be searched are:

1. 2424 South 20th Street, Philadelphia, Pennsylvania.  The building is further described as a two-story row home with light brown bricks on the ground level and darker stucco style exterior on the second floor.  The numbers 2424 are placed to the right of the door.

2. Any and all cellular telephones located inside 2424 South 20th Street, Philadelphia, Pennsylvania.

Photographs of 2424 South 20th Street, Philadelphia, Pennsylvania are attached below:



## ATTACHMENT A (VEHICLE)

The property and vehicle to be searched are:

1. White, 2018 Ford F250 bearing New Jersey registration U15JYJ.

2. Any and all cellular telephones located inside 2018 Ford F250 bearing New Jersey registration U15JYJ.

Photographs of the white 2018 Ford F250 bearing New Jersey registration U15JYJ are attached below:



15

## ATTACHMENT B

*Property to be seized*

The following items which constitute evidence of the commission of violations of the following offenses: making extortionate extensions of credit, in violation of 18 U.S.C. § 892, collections of extensions of credit by extortionate means, in violation of 18 U.S.C. § 894, and use and carrying a firearm during and in relation to a crime of violence, in violation of 18 United States Code, § 924(c)(1)(A) (SUBJECT OFFENSES):

1. Cellular telephones;

2. Financial and business records, including bank statements, canceled checks, checkbooks, passbooks, journals, ledgers, checks, drafts, letters of credit, certificates of deposit, wire transfer documents, money orders, withdrawal tickets, deposit slips, money cash bands, records of mutual funds, stocks, bonds, records of real estate transactions, invoices, bills, loan documents, business and financially-related correspondence and notes, certificates of insurance, lists of assets, records of safe deposit boxes, and all other items evidencing the obtaining, controlling, transfer, and/or concealment of assets and the obtaining, controlling, transfer, concealment and/or expenditure of money;

3. Address and/or telephone books, rolodex indices, business cards, and any papers reflecting names, addresses, telephone numbers, pager numbers, facsimile numbers, electronic mail addresses, and/or telex numbers of business associates, sources of supply, customers, employees, temporary workers, drivers used to transport workers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

4. Corporate and business bookkeeping records and other financial records including trial balances, general ledgers, subsidiary ledgers and journals, disbursement records and/or journals, accounts payable ledgers and records, payroll records, loan receivable and payable ledgers, and cash disbursement journals;

5. Personal financial records including tax records or notes or calculations used to prepare taxes, bookkeeping records, records reflecting budgets, income, expenses, investments, bank accounts and, expenditures including expenditure, investment or deposit of cash, or any record of disposition of cash;

6. Tax records, including tax returns, IRS forms, tax forms of equivalent state and local agencies, and correspondence with the IRS or equivalent state and local agencies;

7. Financial statements, bookkeeper's work papers and/or accountant's work papers used in the preparation of corporate and/or business records and tax returns; and

communications with accountants, bookkeepers, money service businesses, merchants, retailers, credit card companies, and/or banks personal financial records including tax records or notes or calculations used to prepare taxes, bookkeeping records, records reflecting budgets, income, expenses, investments, bank accounts and, expenditures including expenditure, investment or deposit of cash, or any record of disposition of cash;

8.  Any and all banking records, including but not limited to monthly savings and checking statements, canceled checks and banking communications, deposit tickets, withdrawal receipts, certificates of deposits, pass-books, money drafts, money orders (blank or endorsed), check cashing logs, wire transfer logs, cashier's checks, bank checks, money orders, safe deposit box keys, safes, money wrappers and wire transfers.

9.  Indicia of occupancy, residency, and ownership or use of the subject premises, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, identification documents and keys.

10. The term "storage medium" includes any physical object upon which computer data can be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, thumb drives, and other magnetic or optical media.

11. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as film, videos, or photocopies).

12. Surveillance camera recording equipment, including any storage medium associated with these cameras.

13. Records reflecting cashing of checks or any other check cashing business, or disposition of cash proceeds of that activity.

14. Firearms, as well as firearms paraphernalia, such as holsters, purchase boxes and ammunition.

15. United States Currency (USC)

Any and all cellular telephones located inside the SUBJECT RESIDENCE and SUBJECT VEHICLE may be seized and searched for the following items which constitute evidence of the SUBJECT OFFENSES:

1.  Electronic communications relating to the criminal activity,

17

2. Telephone or address directory entries consisting of names, addresses, telephone numbers; logs of telephone numbers dialed, telephone numbers of incoming, outgoing or missed calls, text messages, schedule entries, stored memoranda, videos, social networking sites and digital photographs,

3. Lists of loan customers and related identifying information,

4. Types, amounts, and prices of loans as well as dates, places, and amounts of specific transactions,

5. Any information related to the making of loans, including names, addresses phone numbers, and any other identifying information,

6. Any information related to the methods of providing loans;

7. Any information recording domestic and international schedule or travel related to the described criminal activity, including any information recording a nexus to airport facilities, airport security, or airlines,

8. All bank records, checks, credit cards, credit card bills, account information, and other financial records,

9. Any information related to package delivery services, including but not limited to United States Postal Service, Federal Express and UPS,

10. All data that has been manually programmed into a GPS navigation system, as well as data automatically stored by the GPS navigation system,

11. Stored memoranda; stored text messages; stored electronic mail; stored photographs; stored audio; and stored video,

12. Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software,

13. Evidence of the attachment of other devices,

14. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device,

15. Evidence of the times the device was used,

16. Passwords, encryption keys, and other access devices that may be necessary to access any of the devices,

18

17. Records of or information about Internet Protocol addresses used by the device,

18. Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "Favorite" web pages, search terms that the user entered into any Internet search engine, and records or user-typed web addresses, as well as evidence of the posting of videos, photos, or any material relevant to these crimes to any social networking site.

19. Evidence of user attribution showing who used or owned the electronic devices at the time the things described above were created, edited, or deleted, such as logs phonebooks, saved usernames and passwords, documents, and browsing history.